[Cite as *State ex rel. Seabolt v. State Hwy. Patrol Retirement Sys.*, 2018-Ohio-1377.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Benjamin R. Seabolt, | : | |
| Relator, | : | |
| | : | No. 17AP-52 |
| v. | : | (REGULAR CALENDAR) |
| State Highway Patrol Retirement System, | : | |
| Respondent. | : | |

---

## D E C I S I O N

### Rendered on April 12, 2018

---

**On brief:** *Blaugrund Haynes Kessler Myers & Postalakis, Inc.,* and *Marc E. Myers,* for relator.

**On brief:** *Michael DeWine*, Attorney General, *John J. Danish,* and *Mary Therese J. Bridge,* for respondent.

---

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

BROWN, P.J.

{¶ 1} Relator, Benjamin R. Seabolt, has filed an original action requesting this court issue a writ of mandamus ordering respondent, State Highway Patrol Retirement System (hereafter "respondent" or "retirement system"), to amend its decision approving relator's R.C. 5505.18 application for disability retirement "not in the line of duty," and to enter an amended decision approving the application for disability retirement "in the line of duty."

{¶ 2} This court referred the matter to a magistrate pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals. The magistrate issued the appended

decision, including findings of fact and conclusions of law, recommending this court deny relator's request for a writ of mandamus.

{¶ 3} Relator has filed objections to the magistrate's decision. In his objections, relator argues there is no medical foundation for Dr. David A. Tanner's statement that relator's disabling condition was not in the line of duty. Relator also contends that Dr. Tanner misunderstands "pre-existing" for purposes of disability retirement.

{¶ 4} As set forth in the magistrate's findings of fact, relator filed a disability benefit application on June 6, 2016. On the application, relator listed December 22, 2015 as the date of the onset of the illness, injury or condition. Relator submitted medical reports, including an attending physician form in which his physician provided diagnoses of "disc herniation," "disc degeneration," and "spinal stenosis." Dr. Michael J. Griesser subsequently examined relator at the request of respondent. Dr. Tanner, a medical advisor for respondent, reviewed the medical information and issued a report dated August 1, 2016. On August 18, 2016, the executive director of the retirement system informed relator that the Health Wellness and Disability Committee ("disability committee") had voted to recommend approval of the disability application "not in the line of duty."

{¶ 5} Relator requested reconsideration and submitted additional medical information. Dr. Tanner reviewed the new information and issued a second report dated October 4, 2016. The disability committee again considered the application and voted unanimously to confirm the original recommendation. On October 20, 2016, the retirement system board considered the disability committee's recommendation and voted to approve the application for disability retirement not in the line of duty.

{¶ 6} In general, "a member of the Ohio Highway Patrol Retirement System is eligible for disability retirement if the member 'becomes totally and permanently incapacitated for duty in the employ of the state highway patrol.' " *State ex rel. Burroughs v. Ohio Hwy. Patrol Retirement Sys. Bd.,* 150 Ohio St.3d 326, 2017-Ohio-6923, ¶ 17, quoting R.C. 5505.18(A). In deciding whether this standard is met, "the board 'shall consider the written medical * * * report, opinions, statements, and other competent evidence.' " *Id.*, quoting R.C. 5505.18(A).

{¶ 7}   R.C. 5505.18(A) states in part:

> Upon the application of a member of the state highway patrol retirement system, a person acting on behalf of a member, or the superintendent of the state highway patrol on behalf of a member, a member who becomes totally and permanently incapacitated for duty in the employ of the state highway patrol may be retired on disability by the board. To be eligible for retirement on account of disability incurred not in the line of duty, a member must have five or more years of service credit according to rules adopted by the board.
>
> The medical or psychological examination of a member who has applied for disability retirement shall be conducted by a competent health-care professional or professionals appointed by the board. The health-care professional or professionals shall file a written report with the board containing the following information:
>
> (1) Whether the member is totally incapacitated for duty in the employ of the patrol;
>
> (2) Whether the incapacity is expected to be permanent;
>
> (3) The cause of the member's incapacity.

{¶ 8}   In the instant action, respondent approved relator's request for disability retirement benefits, but found the disability occurred "not in the line of duty" (rather than "in the line of duty").  Ohio Adm.Code 5505-3-02(A)(4) defines "[i]n the line of duty" to mean "an illness or injury that occurred during or resulted from the performance of official duties under the direct supervision of the state highway patrol."  Ohio Adm.Code 5505-3-02(A)(5) defines "[n]ot in the line of duty" to mean "an illness or injury that did not occur during or result from the performance of official duties under the direct supervision of the state highway patrol."

{¶ 9}   Under Ohio law, "[a] benefits determination, even when there are facts in dispute, 'is within the final jurisdiction of the [retirement system], subject to correction by action in mandamus only upon a showing of an abuse of discretion.' " *Burroughs* at ¶ 25, quoting *State ex rel. Crosby v. Dept. of Mental Retardation,* 38 Ohio St.3d 179 (1988). Further, " '[t]he quantum of evidence necessary to support the retirement-system board's decision is not a heavy one.' " *Id.,* quoting *State ex rel. Nese v. State Teachers Retirement*

*Bd. of Ohio,* 136 Ohio St.3d 103, 2013-Ohio-1777, ¶ 26. As long as there is "sufficient evidence" to support a retirement system board's decision, a reviewing court will not disturb it. *State ex rel. Grein v. Ohio State Hwy. Patrol Retirement Sys.,* 116 Ohio St.3d 344, 2007-Ohio-6667, ¶ 9. *See also State ex rel. Woodman v. Ohio Pub. Emps. Retirement Sys.,* 144 Ohio St.3d 367, 2015-Ohio-3807, ¶ 17 ("The [retirement] board abuses its discretion—and a clear right to mandamus exists—if it enters an order that is not supported by some evidence.").

{¶ 10} Relator's contention there is no "medical foundation" for Dr. Tanner's conclusion that his disabling condition was not in the line of duty is not persuasive. In his report of August 1, 2016, Dr. Tanner noted the July 13, 2016 report of Dr. Griesser indicated diagnoses of disc protrusion and "degenerative disc disease at L5-S1." Dr. Tanner opined, based on his review of "the documented clinical history," as well as the "diagnostic findings and the consultative medical reports," that relator's conditions "did not occur in the line of duty" but, rather, "the conditions * * * are congenital and degenerative in nature and were pre-existing prior to the 12/22/15 date."

{¶ 11} Following the August 18, 2016 correspondence from respondent's executive director to relator, notifying him the disability committee voted to recommend approval of the disability retirement benefit application "not in the line of duty," relator submitted additional medical evidence on reconsideration. Dr. Tanner reviewed the newly submitted medical evidence and issued another report dated October 4, 2016. In that report, Dr. Tanner noted that a 2014 report of a neurosurgeon indicated relator's low back pain "began without any specific accident, injury or fall." Dr. Tanner further noted the medical evidence indicated "congenital structural conditions" of relator's "spine, diagnostic evaluation * * * indicated degenerative endplate disease, foraminal stenosis, degenerative disc disease," and "lack of diagnostic MRI changes to indicate 'substantial aggravation' of a pre-existing condition (Lumbar MRI's 2013 to 2016)." Dr. Tanner further opined that "the probability of an essentially healthy 31 year old male having a service belt cause these degenerative changes within a 9 year window is medically improbable and thus not in the line of duty."

{¶ 12} Here, Dr. Tanner agreed there was a disability, but the disabling condition did not occur in the line of duty. Rather, Dr. Tanner found the incapacity was the result of

a degenerative condition. Dr. Tanner reviewed medical reports which indicated a "degenerative disc disease at L5-S1," and found the condition to be "congenital and degenerative in nature." As noted, there was no indication of any specific accident, injury or fall, and Dr. Tanner addressed the issue of whether wearing a service belt caused the condition. Based on his review of the medical evidence, Dr. Tanner opined that wearing a service belt would not have caused the degenerative changes over the time frame at issue. Upon review, and contrary to relator's contention, the record contains medical evidence to support Dr. Tanner's determination that relator's incapacity was the result of a degenerative and congenital condition, unrelated to the performance of his duties (including the wearing of a service belt).

{¶ 13} Relator's contention that Dr. Tanner misunderstands "pre-existing" for purposes of disability retirement is also not persuasive. According to relator, Dr. Tanner improperly interpreted pre-existing to mean anything prior to 2016. Relator appears to challenge Dr. Tanner's observation there was no discernible change between a 2013 MRI and a 2016 MRI.

{¶ 14} As noted under the facts, relator listed December 22, 2015 as the onset of his disability. Here, we do not construe Dr. Tanner's statement that there was no discernible change between the pre-2015 MRI and the post-2015 MRI as a misunderstanding of "pre-existing." Again, there was medical evidence of a degenerative and congenital condition, and the report of Dr. Tanner indicates he considered the issue of whether the duties performed by relator either caused or aggravated that condition.

{¶ 15} The fact that the record may contain medical opinions that differ with Dr. Tanner's opinion "is inconsequential." *Burroughs* at ¶ 34. Further, in reaching its determination that the disabling condition was not in the line of duty, "the board was not required" to accept the medical opinion of a treating physician or a consultative physician "over the opinion of a different independent medical examiner." *Id.* Upon review, we agree with the magistrate's determination the reports of Dr. Tanner provided the retirement system board with some evidence to support its determination relator is disabled but not in the line of duty.

{¶ 16} Following an examination of the magistrate's decision, as well as an independent review of the record, we overrule relator's objections to the magistrate's

decision. Accordingly, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein, and deny relator's request for a writ of mandamus.

*Objections overruled; writ of mandamus denied.*

TYACK and DORRIAN, JJ., concur.

———————————————

# APPENDIX

### IN THE COURT OF APPEALS OF OHIO

### TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| The State ex rel. Benjamin R. Seabolt, | : | |
| Relator, | : | |
| v. | : | No. 17AP-52 |
| State Highway Patrol Retirement System, | : | (REGULAR CALENDAR) |
| Respondent. | : | |

### M A G I S T R A T E ' S   D E C I S I O N

**Rendered on August 31, 2017**

*Blaugrund Haynes Kessler Myers & Postalakis,* and *Marc E. Myers,* for relator.

*Michael DeWine*, Attorney General, *John J. Danish,* and *Mary Therese J. Bridge,* for respondent.

### IN MANDAMUS

{¶ 17} In this original action, relator, Benjamin R. Seabolt, requests a writ of mandamus ordering respondent, State Highway Patrol Retirement System, to amend its October 20, 2016 decision approving relator's R.C. 5505.18 application for disability

retirement not in the line of duty, and to enter an amended decision approving the application for disability retirement in the line of duty.

<u>Findings of Fact</u>:

{¶ 18} 1. On June 6, 2016, relator completed a disability benefit application on a form provided by respondent, State Highway Patrol Retirement System ("HPRS"). The form is divided into four parts.

{¶ 19} At part I, the form presents several questions to the applicant. The form asks the applicant to "provide a brief description of your illness, injuries, or conditions that limit your ability to work as a trooper?"

> In the space provided, relator responded:

> L5-S1 disk space collapse and right side disk bulge. Degenerative endplates on L5-S1 vertebra. Facet arthrosis of L5-S1.

{¶ 20} At part I, the form presents the query: "Date you entered the Ohio State Highway Patrol Academy." In response, relator entered May 16, 2007.

{¶ 21} The form presents the query: "Did your illness, injury or condition occur in the line of duty?" In response, relator marked the "Yes" box.

{¶ 22} The form also presents the query: "What is the date of the onset of the illness, injury, or condition that is the cause for this application?" In response, relator wrote "12/22/2015."

{¶ 23} Part II of the form is captioned "Self-Assessment." The applicant is asked to list the tasks he is unable to perform and the percentage of the day devoted to performing the task. In the space provided, relator wrote:

> Unable to wear duty belt            100%
> Struggle with resistors             Unknown
> Pursue violators on foot            Unknown
> Enter/exit patrol car repeatedly    50%

{¶ 24} Part III of the form is captioned "Physician Care and Medical Treatment." The form asks the applicant to name the treating physician. In response, relator named chiropractor Christian E. Gedeon, D.C. Relator indicated that December 23, 2015 is the date he first saw Dr. Gedeon for the condition.

{¶ 25} The form also asks the applicant to list the names of all physicians that he has seen over the past five years. In response, relator listed "Dr. Jed Bell" and "Dr. Christian Bonasso."

{¶ 26} Part IV of the form is captioned "Spouse and Dependents." Relator indicates that he was married on April 4, 2009. He also indicates that he is currently "On Light Duty."

{¶ 27} At Part IV, relator executed an affidavit on June 6, 2016 that certifies that the information provided is complete and true.

{¶ 28} 2. On June 6, 2016, Dr. Gedeon completed a HPRS form captioned "Attending Physician Medical Evaluation."

{¶ 29} The form asks the attending physician to state the "Cause of Incapacity/What condition(s) are you treating?" In response, Dr. Gedeon wrote "Disc herniation putting pressure on the left and right S1 nerve root." For the diagnosis, Dr. Gedeon wrote "disc herniation," "disc degeneration," and "spinal stenosis."

{¶ 30} The form asks the attending physician: "Which of the listed duties and responsibilities is the applicant unable to perform, and what specific disabling condition prevents performance?"

{¶ 31} In the space provided, Dr. Gedeon wrote:

> Don't want patient to have duty belt or be in patrol car for long periods. Should not have to subdue violators of any type.

{¶ 32} The form asks the attending physician to mark the appropriate box indicating his disability opinion. Dr. Gedeon marked the box aside the pre-printed statement "TOTALLY AND PERMANENTLY INCAPACITATED* to perform specific job duties and responsibilities in the employ of the patrol." (Emphasis sic.)

{¶ 33} 3. On June 6, 2016, with his application, relator submitted a report regarding a February 1, 2016 MRI performed at the Hocking Valley Community Hospital. The MRI was ordered by Dr. Gedeon. In his three-page report regarding the MRI, interpreting physician Lewis MacLaughlin gave his impression which compared the February 1, 2016 MRI to a previous MRI conducted at Hocking Valley Community Hospital on October 3, 2013. For his impression, Dr. MacLaughlin states:

[One] No significant change since MRI of 10/3/2013. Lumbosacral transitional vertebra is again designated as S1.

[Two] L5-S1: A broad-based annular bulge and superimposed right foraminal/far lateral disc protrusion and mild facet arthrosis again result in effacement of the ventral epidural space, mild narrowing of the right lateral recess, and mild to moderate right and mild left foraminal stenosis. No central spinal canal stenosis at any visualized level.

[Three] Mild dextroconvex scoliosis of lumbar spine.

{¶ 34} 4. On June 6, 2016, with his application, relator submitted a two-page letter or report from Christian Louis Bonasso, M.D. to Dr. Gideon regarding an April 25, 2016 office visit. In the April 25, 2016 office note, Dr. Bonasso states:

I had the opportunity to talk with Benjamin Seabolt with the chief complaint of low back pain and right lower extremity pain that radiates to just above his knee. This has been going on for quite some time, and he attributes it to him having to wear a 25-pound gun belt for the last 9 years. He has tried facet blocks, RF ablation, and chiropractic therapy, but no epidural steroid injections. His past medical and surgical history are noncontributory. He is on no medications. He has no drug allergies.

Physical exam shows 5/5 strength in both upper and lower extremities. Deep tendon reflexes and sensation are intact. No pathological reflexes are noted. He denies any bowel, bladder or sexual dysfunction. Cranial nerves 2-12 are intact. He has no drift. He has a negative finger-to-nose test.

MRI scanning shows L5-S1 disk space collapse with a right-sided disk bulge.

DIAGNOSIS
L5-S1 disk space collapse and right-sided disk bulge.

TREATMENT OPTIONS AND PLAN
I told Mr. Seabolt that I would like to get a diskogram at the L5-S1 level, along with a control level. He asked about a simple right-sided decompression discectomy. I told him that this was an option, but given the look of his anatomy he most likely is going to need a fusion done sooner rather than later. He works as a state trooper, and my feeling is that he

will be unable to return to full duty. All of his questions have been answered.

{¶ 35} 5. On July 13, 2016, at the request of HPRS, relator was examined by Michael J. Griesser, M.D. Dr. Griesser was an examining physician selected pursuant to Ohio Adm.Code 5505-3-02(C).

{¶ 36} 6. In his four-page narrative report, Dr. Griesser states:

> **HISTORY OF PRESENT ILLNESS:**
> The history provided in this section of my report is a compilation of information obtained from Mr. Seabolt on the date I examined him, July 13, 2016, and as was found in the provided medical records.
>
> Mr. Benjamin Seabolt was evaluated in the office today with respect to a several year history of low back and right lower extremity pain that radiates to just above his right knee. He has had an extensive course of treatment to date including extensive chiropractic therapy primarily from Dr. Gideon, facet blocks and ablation. His pain level has been reported to be 5/10 on a scale of 1 to 10 and constant in nature and increased by certain activities.
>
> Recently, he has been surgically evaluated by Dr. Bonasso who is recommending a discogram and surgical intervention to include a fusion at L5-S1 versus decompressive discectomy.
>
> On February 1, 2016, Mr. Seabolt had an MRI scan done of his lumbar spine that revealed as its impression; no significant change since the MRI of October 3, 2013. Lumbosacral transitional vertebrae is again designated as S1; at L5-S1 there was found to be a broad-based annular bulge and superimposed right foraminal/far lateral disc protrusion and mild facet arthrosis again resulting in effacement of the ventral epidural space, mild narrowing of the right lateral recess and mild to moderate right and mild left foraminal stenosis; no central spinal canal stenosis is visualized at any level; mild dextroconvex scoliosis of the lumbar spine.

On evaluation today, Mr. Seabolt reports a several year history of low back and lower extremity pain that is ongoing in nature and is increased by certain activities. For example, he relates wearing his gun belt increases his symptoms as does certain other aspects of his usual work duties including prolonged sitting in his patrol car, entering and exiting his vehicle, and bending at the waist or running.

* * *

**ASSESSMENT**
The history as reported by Mr. Seabolt, results of the physical examination and review of the provided records were used as the sources of information and facts upon which my conclusions, opinions and report were based. All conclusions and opinions are based upon a reasonable degree of medical probability.

**[One] What is the diagnosis?**

Based on today's evaluation, the diagnoses for Mr. Seabolt are L5-S1 disc protrusion and degenerative disc disease at L5-S1.

**[Two] In your medical opinion, is the patient's medical condition likely to improve in the future?**

Yes, I would expect improvement in the patient's medical condition in the future presuming he undertakes appropriate medical treatment, which has been proposed by Dr. Bonasso to include a discogram followed either by discectomy or fusion with Dr. Bonasso preferring the fusion.

**[Three] Do you recommend a treatment plan for this patient's medical condition?**

I agree with the proposed medical treatment of Dr. Bonasso in regard to his lumbar spine issues, a discogram followed likely by a fusion procedure.

**[Four] Other comments regarding the patient's medical conditions.**

Conservative treatment is unlikely to relieve the patient's complaints, noting he has had such measures without real benefit leaving surgery as the recommended treatment.

**[Five] Is the patient totally and permanently incapacitated for duty with the Ohio State Highway Patrol or is the patient not totally and permanently incapacitated for duty with the Ohio State Highway Patrol?**

It is my opinion Mr. Seabolt is totally and permanently disabled from working for the Ohio State Highway Patrol as he is not able to perform his full job duties. While the proposed fusion surgery will likely relieve most of his pain complaints, he would not now or post-fusion surgery physically be able to fully engage in duties where he might be involved in a physical altercation, would likely require lifting/carry[ing]/pushing and pulling restrictions as well as restrictions on bending, crawling, kneeling and crouching, would not be able to wear the required body armor or gun belt, and/or run for longer distances, all of which are, in my opinion, inconsistent with the physical demands of his current work as described in the listing of his job duties.

{¶ 37} 7. On August 1, 2016, HPRS medical advisor David A. Tanner, D.O. wrote:

I have reviewed the Application for Disability Benefits and the medical records that were provided with the application. Trooper Seabolt is a 31 year old male who indicates that on 12/22/2015 the repeated and extended wearing of his duty belt caused arthritis and pinched nerve in his lower right back and right hip. Trooper Seabolt was initially seen by Christian E. Gedeon DC. Dr. Gedeon is Trooper Seabolt's current Physician of Record for the conditions regarding his application. It is noted from the medical records reviewed Trooper Seabolt has a significant history of Low Back Pain and what appears from the [medical record], received previous diagnostics and treatments.

For the applied date of injury of 12/22/15 Trooper Seabolt was initially treated conservatively with chiropractic therapy, however he did progress to diagnostics of Lumbar MRI on 2/1/16, this was compared to a previous Lumbar MRI on 10/3/13. The findings on the 2/1/16 report indicate in addition to the L5-S1 disc bulge, Lumbosacral transitional vertebrae at S1 and dextroconvex scoliosis of the Lumbar spine.

Trooper Seabolt progressed to evaluation by Dr. Bonasso a neurosurgeon, who opined recommending a discogram and

surgical intervention of discectomy with probable fusion of L5-S1 given Trooper Seabolt's anatomy.

Review [o]f the IME report from Michael Griesser M.D. dated 7/13/2016 indicates Trooper Seabolt with a several year history of low back and lower extremity pain. Dr. Griesser's opined diagnosis is L5-S1 disc protrusion and degenerative disc disease at L5-S1. Dr. Griesser anticipates/expects the condition of Trooper Seabolt to improve with the proposed treatment by neurosurgeon Dr. Bonasso. Dr. Griesser opines that Trooper Seabolt is totally and permanently disabled from working for the Ohio State Highway Patrol at his current medical state and likely to continue permanent disability after the surgical intervention of Fusion L5-S1.

I concur with the medical opinion of D. Griesser that Trooper Seabolt is totally and permanently incapacitated to perform the job duties of the Ohio State Highway Patrol.

However, given the documented clinical history of the low back complaints, diagnostic findings and the consultative medical reports I opine that Trooper Seabolt's conditions did not occur in the line of duty. The conditions of Trooper Seabolt are congenital and degenerative in nature and were pre-existing prior to the 12/22/15 date. It is also noted that I do not believe there is any substantial aggravation of this pre-existing condition as the Lumbar MRI's from 2/1/16 and 10/3/13 indicate no significant change in comparison.

{¶ 38} 8. By letter dated August 4, 2016, HPRS executive director Mark Atkeson informed relator that the Health, Wellness and Disability Committee ("HWD Committee") will review his disability application on August 18, 2016. The letter further advised:

You have the right to attend the August 18th meeting, with or without legal counsel, to present testimony. No additional medical evidence will be accepted at the hearing. You are not required to attend.

{¶ 39} 9. By letter dated August 18, 2016, Atkeson informed relator:

This letter is to advise you that the Health, Wellness and Disability (HWD) Committee voted on August 18, 2016, to recommend that the Board **approve** your disability application **not in the line of duty**. The full Board will

consider the Committee's recommendation at the October 20, 2016 Board meeting. * * *

Within ten (10) days of receiving notification of the disability committee's recommendations, you may file a request for reconsideration. The written request shall be accompanied by a statement from the applicant, his or her counsel and/or attending physician that the request for reconsideration will be based on evidence contrary to the findings of the examining physician or the committee.

Within twenty (20) days of receiving notification of the disability committee's recommendations, you must file new medical evidence relative to the disabling condition(s) considered by the disability committee.

There is no provision for you to speak before the Board, nor are you required to attend. However, Board meetings are public meetings, with the exceptions of executive session for the purpose of discussing disabilities. Within 10 days after the Board meets, you will be notified by certified mail of the Board's decision and if applicable, the effective date of the disability retirement.

(Emphasis sic.)

{¶ 40} 10. The record contains a two-page memorandum dated August 18, 2016 to the disability committee from Atkeson. Atkeson stated:

**Background Information:**
On June 6, 2016, Sergeant Benjamin R. Seabolt, age 31, filed an application for disability benefits with HPRS. The application was properly submitted and accepted by HPRS staff. In his application, Sergeant Seabolt stated the reasons for his disability were: L5-S1 disc space collapse and right side disc bulge; degenerative end plates on L5-S1 vertebral; and facet arthrosis of L5-S1. On his application, Sergeant Seabolt indicated his condition occurred in-the-line-of-duty; however, he provided no explanation as to why. He recorded the date of onset as December 22, 215. There is reference in other documentation where he stated his symptoms increase due to wearing of the gun belt, prolonged sitting in his patrol car, entering and exiting his vehicle, bending at the waist, and running.

Sergeant Seabolt is a graduate of Academy Class #148 which began on May 16, 2007, and currently has 9.2 years of service.

**Attending Physician:** On June 6, 2016, Dr. Christian Gedeon (chiropractic) concluded that Sergeant Seabolt was totally and permanently incapacitated to perform the specific job duties and responsibilities in the employ of the Patrol. This is due to several listed back issues. His prognosis was that Sergeant Seabolt's condition would not improve without surgery. Dr. Bonasso (neurosurgeon) also evaluated Sergeant Seabolt and recommended a discogram and surgical intervention of discectomy with probable fusion of L5-S1.

**Board Independent Medical Examiner:** On July 13, 2016, Dr. Michael Griesser examined Sergeant Seabolt and provided the diagnosis of L5-S1 disc protrusion and degenerative disc disease. Dr. Griesser concluded, "*It is my opinion Mr. Seabolt is totally and permanently disabled from working for the Ohio State Highway Patrol as he is not able to perform his full job duties.*" Dr. Griesser also opined that Sergeant Seabolt would not be able to fully engage in the duties required by the Patrol even after surgery.

**HPRS Medical Advisor:** On August 1, 2016, Dr. David Tanner concurred with Dr. Griesser and concluded that Sergeant Seabolt "... *is totally and permanently incapacitated to perform the job duties of the Ohio State Highway Patrol.*" He further concluded, "... *I opine that Trooper Seabolt's conditions did not occur in the line of duty.* The conditions of Trooper Seabolt are congenital and degenerative in nature and were pre-existing prior to the 12/25/15 date. It is also noted that I do not believe there is any substantial aggravation of this pre-existing condition as the Lumbar MRIs from 2/1/16 and 10/3/13 indicate no significant change in comparison.

(Emphasis sic.)

{¶ 41} 11. On August 30, 2016, by email to HPRS, relator requested reconsideration.

{¶ 42} 12. By letter dated September 28, 2016, relator's counsel advised Atkeson of his representation of relator. Appended to the letter are several additional medical reports submitted in support of reconsideration.

{¶ 43} Appended to the letter is the September 9, 2016 report of Dr. Gideon who states:

> It is my professional opinion that his pain has been ongoing since at least 2013 while working for the Ohio State Highway Patrol causing him to have lower back pain with pain down his right buttocks and posterior thigh, positive MRI was shown, x-rays were shown to have arthritis, degeneration, and disc herniation at L5-S1. His pain is directly and casually related to his work.

{¶ 44} Appended to the letter is the September 19, 2016 report of Dr. Bonasso who states:

> I had the opportunity to talk with Mr. Seabolt. We had a long discussion about his disk bulge and collapse at L5-S1. Within a reasonable degree of medical probability, meaning more likely than not, this gentleman's disk bulging and collapse at the L5-S1 level is due to repetitive injury of carrying an over 22-pound utility belt and getting in and out of a police cruiser thousands of times over the course of his career. Not having any back problems before early 2013, when the repetitive aggravation finally began to take its toll on him. The physical activity of getting in and out of a car over and over again with the added weight around the waist has caused his ultimate disk bulging and collapse.
>
> He has pain and numbness that radiates down both legs, in the lateral aspect of both feet. He has plantar flexor weakness in the 4 out of 5 range. He has failed all conservative measures.
>
> In rebuttal to Dr. Ahn, this gentleman more than qualifies for a lumbar fusion in that his disk is collapsed down, indicating instability. He also has what are noted as modic end-plate changes, which also are indicative of micro instability and inflammation of the disk space. Given these findings and the findings of lumbar disk protrusion, a fusion is more than indicated.
>
> I would also state Mr. Seabolt is permanently and totally disabled and cannot return to his job as a police officer.

{¶ 45} Appended to the letter is the September 1, 2016 single-page report of Jed Bell, D.O.  Dr. Bell opines:

Mr. Seabolt has been a patient of mine since 2013. He did not have pain prior to 2012. MRI imaging does indicate disc bulge at the L5-S1 level. I do feel that wearing his gun belt as well as getting in and out of his cruiser over the course of multiple years (worked 9-10 years for highway patrol) is more likely than not the source of his disc bulging and associated low back and radiating leg pain. Due to the weight of a gun belt this is known to put additional strain on the lower back structures and again, is more likely than not, the main reason he developed the L5-S1 disc bulge and associated pain.

{¶ 46} Appended to the letter are various progress notes from the doctors, including Dr. Ying H. Chen.

{¶ 47} 12. On October 4, 2016, Dr. Tanner issued another report regarding reconsideration.  Dr. Tanner stated:

I have reviewed the newly submitted medical records of Trooper Seabolt for reconsideration of an in the line duty disability. Trooper Seabolt entered the Ohio State Highway Patrol on 05/16/2000, class of 148.

The medical records of Dr. Gedeon indicate that Trooper Seabolt had been experiencing low back pain since 03/2013.

[Medical record] report dated 9/1/2016 reviewed from Jed Bell DO. Dr. Bell indicates that Trooper Seabolt has been following up [with] Dr. Bell since 2013 for pain management. [Medical record] initial note from Dr. Bell dated 10/25/2013 indicates Trooper Seabolt attributes his low back pain from his repetitive activity getting in and out of his car at work.

[Medical record] report from Dr. Chen a Neurosurgeon dated 4/11/2014, indicates Trooper Seabolt's low back pain "began without any specific accident, injury or fall, although he does wear a utility belt as a police officer and does frequent bending, lifting, and getting in and out of the car."

Given the review of the recent medical records submitted, diagnostic evaluation to indicate congenital structural conditions of Trooper Seabolt's spine, diagnostic evaluation to indicated degenerative endplate disease, foraminal stenosis, degenerative disc disease, lack of diagnostic MRI changes to indicate "substantial aggravation" of pre-existing condition (Lumbar MRI's 2013 to 2016) and the medical opinion that the probability of an essentially healthy 31 year

old male having a service belt cause these degenerative changes within a 9 year window is medically improbable and thus not in the line of duty.

It is my medical opinion that Trooper Seabolt is and will continue to be totally and permanently incapacitated to perform the job duties of the Ohio State Highway Patrol.

{¶ 48} 13. By letter dated October 7, 2016, Atkeson informed relator that the HWD Committee will hear the request for reconsideration on October 19, 2016. The letter further advised:

You have the right to attend the October 19th meeting, with or without legal counsel, to present testimony. The disability committee will consider only new medical evidence and new relevant information submitted in the support of the request for reconsideration. No new medical evidence will be accepted at the hearing. You are not required to attend.

{¶ 49} 14. On October 19, 2016, Atkeson updated his August 18, 2016 memorandum to the disability committee. Atkeson wrote:

**HW&D Committee Recommendation:** On August 18, 2016, the HW&D Committee voted unanimously to recommend to the board an off-duty disability. On August 30, 2016, Sergeant Seabolt requested a reconsideration hearing. On September 29, 2016, HPRS received his additional medical information. Dr. Tanner reviewed the information and concluded, "*Given the review of the recent medical records submitted ... and the medical opinion that the probability of an essentially healthy 31 year old male having a service belt cause these degenerative changes within a 9 year window is medically improbable and thus not in the line of duty.*"

(Emphasis sic.)

{¶ 50} 15. The October 19, 2016 minutes of the HWD Committee indicate that, on that date, the committee unanimously voted "[t]o confirm the original recommendation by the Committee of an off-duty disability."

{¶ 51} 16. The October 20, 2016 minutes of the HPRS board indicate that the board unanimously approved "an off-duty disability" for relator.

{¶ 52} 17. By letter dated October 21, 2016, executive director Atkeson informed relator:

> This letter is to advise you that the Health, Wellness and Disability (HWD) Committee heard your request for reconsideration for your disability application on October 19, 2016, and voted to recommend the HPRS board to approve your disability application not-in-the-line-of-duty.
>
> The full board considered the committee's recommendation at the October 20, 2016, board meeting, and voted to approve your application for disability retirement not-in-the-line-of-duty, effective October 30, 2016. The decision of the board is final per ORC 5505.18(A).

(Emphasis sic.)

{¶ 53} 18. On January 20, 2017, relator, Benjamin R. Seabolt, filed this original action.

Conclusions of Law:

{¶ 54} The main issue is whether the August 1 and October 4, 2016 reports of Dr. Tanner provided the HPRS board with "sufficient evidence" (or "some evidence") to support its determination that relator is totally and permanently incapacitated for duty in the employ of the patrol but not in the line of duty pursuant to R.C. 5505.18(A) and Ohio Adm.Code 5505-3-02(A).

{¶ 55} The magistrate finds that the reports of Dr. Tanner did provide the HPRS board with "sufficient evidence" (or "some evidence") to support its determination that relator is disabled but not in the line of duty.

{¶ 56} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.

### The Pertinent Statutes

{¶ 57} R.C. 5505.04 vests the general administration and management of the HPRS with the "state highway patrol retirement board" ("board").

{¶ 58} R.C. 5505.18(A) provides:

> The medical or psychological examination of a member who has applied for disability retirement shall be conducted by a competent health-care professional or professionals appointed by the board. The health-care professional or

professionals shall file a written report with the board containing the following information:

(1) Whether the member is totally incapacitated for duty in the employ of the patrol;

(2) Whether the incapacity is expected to be permanent;

(3) The cause of the member's incapacity.

The board shall determine whether the member qualifies for disability retirement and its decision shall be final.

### Pertinent Regulations Promulgated by the Board

{¶ 59} Currently and at the time of the board's final decision at issue here, Ohio Adm.Code 5505-3-02(A) provides the following definitions:

(3) "Totally and permanently incapacitated" means a disabling condition that physically or mentally totally incapacitates a member from the performance of regular duty for a period of at least twelve months from the date of HPRS's receipt of the completed application packet.

(4) "In the line of duty" means an illness or injury that occurred during or resulted from the performance of official duties under the direct supervision of the state highway patrol.

(5) "Not in the line of duty" means an illness or injury that did not occur during or result from the performance of official duties under the direct supervision of the state highway patrol. * * *

(6) "Disability committee," as referred to in this rule, shall mean the "health, wellness, and disability" standing committee established pursuant to paragraph (A)(1) of 5505-9-08 of the Administrative Code.

(7) "Medical advisor," as referred to in this rule, shall mean the expert physician appointed by HPRS' board who advises the disability committee and board during its deliberations relating to disability applications.

(8) "Examining physician" means a physician recommended by the medical advisor and approved by the HPRS board.

{¶ 60} Currently and at the time of the board's final decision at issue here, Ohio Adm.Code 5505-3-02(C) provides:

> Upon receipt of a completed application packet, HPRS shall schedule the applicant for an examination by at least one examining physician with expertise in the disabling condition(s) listed in the application as recommended by the medical advisor, unless the medical advisor recommends it is inadvisable to do so.

{¶ 61} Currently and at the time of the board's final decision at issue here, Ohio Adm.Code 5505-3-02(D) provides:

> After examining the applicant and reviewing the application packet, any medical reports submitted by the applicant, and the results of any additional medical testing, the examining physician will file a written report with HPRS with the following information:
> (1) Whether the member is totally incapacitated for duty in the employ of the patrol,
>
> (2) Whether the incapacity is expected to be permanent, and
>
> (3) The cause of the member's incapacity.

{¶ 62} Effective May 18, 2017, the following provision was added to Ohio Adm.Code 5505-3-02:

> (E) After the examining physician(s)' report(s) is submitted, the medical advisor shall review the entire record and file a written report with HPRS with the following information:
>
> (1) A recommendation of whether the applicant should be granted disability retirement benefits based on the medical advisor's independent review or the record,
>
> (2) Whether the injury or illness was in the line of duty or not in the line of duty,
>
> (3) Recommended medical treatment and medical reports.
>
> The medical advisor's report shall be considered an independent medical opinion.

**Basic Law**

{¶ 63} As long as there is "sufficient evidence" to support the final decision of the HPRS board regarding relator's application for a disability retirement, this court will not disturb the decision.  *State ex rel. Grein v. Ohio State Hwy. Patrol Retirement Sys.,* 116 Ohio St.3d 344, 2007-Ohio-6667; *State ex rel. Burroughs v. Ohio Hwy. Patrol Retirement Sys. Bd.,* 2017-Ohio-6923 at ¶ 24; *State ex rel. Gerke v. Bd. of Ohio Hwy. Patrol Retirement Sys.*, 10th Dist. No. 12AP-732, 2013-Ohio-3624.

### Analysis: Some Observations Regarding the
### Reports of Drs. Griesser and Tanner

{¶ 64} In his report, as previously noted, Dr. Griesser states:

> On evaluation today, Mr. Seabolt reports a several year history of low back and lower extremity pain that is ongoing in nature and is increased by certain activities. For example, he relates wearing his gun belt increases his symptoms as does certain other aspects of his usual work duties including prolonged sitting in his patrol car, entering and exiting his vehicle, and bending at the waist or running.

Later in his report, Dr. Griesser opines:

> Based on today's evaluation, the diagnoses for Mr. Seabolt are L5-S1 disc protrusion and degenerative disc disease at L5-S1.
>
> * * *
>
> It is my opinion Mr. Seabolt is totally and permanently disabled from working for the Ohio State Highway Patrol as he is not able to perform his full job duties. While the proposed fusion surgery will likely relieve most of his pain complaints, he would not now or post-fusion surgery physically be able to fully engage in duties where he might be involved in a physical altercation, would likely require lifting/carry[ing]/pushing and pulling restrictions as well as restrictions on bending, crawling, kneeling and crouching, would not be able to wear the required body armor or gun belt, and/or run for longer distances, all of which are, in my opinion, inconsistent with the physical demands of his current work as described in the listing of his job duties.

{¶ 65} The magistrate observes that Dr. Griesser fails to opine as to whether or not relator's injury was in the line of duty.  Thus, HPRS's examining physician, Dr. Griesser,

fails to offer a medical opinion on a critical issue of the disability application, notwithstanding that he noted relator's statement at the July 13, 2016 examination that wearing his gun belt increases his symptoms as does other aspects of his usual work duties. Accordingly, the magistrate concludes that Dr. Griesser's report, by itself, does not provide sufficient evidence to support a board determination as to whether the injury was in the line of duty.

{¶ 66} Notwithstanding the flaw in Dr. Griesser's report, Dr. Tanner's August 1, 2016 report arguably cures the problem.

{¶ 67} That is, in his August 1, 2016 report, Dr. Tanner indicates that he has reviewed Dr. Griesser's report and concurs with Dr. Griesser's opinion that relator is totally and permanently incapacitated from performance of his duty as a patrol officer. Dr. Tanner then offers his own medical opinion that relator's disability "did not occur in the line of duty." Presumably, Dr. Tanner premised his opinion on the line of duty issue upon his acceptance of the findings presented in the report of Dr. Griesser since Dr. Tanner did not examine relator.

{¶ 68} Here, relator suggests that Dr. Tanner cannot render an opinion that the injury did not occur in the line of duty because Dr. Tanner did not examine relator.

{¶ 69} Indicating that "Dr. Tanner only did a 'paper review' of this matter" and "[h]e did not actually examine Relator," relator concludes in his brief:

> Dr. Tanner's conclusion certainly finds no support in Dr.
> Griesser's Report, the independent medical examiner hired
> by OSHPRS to examine Relator.

(Relator's brief at 15.)

{¶ 70} Thus, relator suggests that Dr. Tanner was not competent to render an opinion as to whether the injury occurred in the line of duty because Dr. Tanner did not examine relator. Relator's suggestion is incorrect. Relator fails to support his suggestion with citation to any statute or rule promulgated by respondent. Moreover, while current Ohio Adm.Code 5505-3-02(E) seems to answer relator's argument, the rule became effective on May 18, 2017 and thus becomes pertinent only if the rule is interpreted as merely giving clarity to what the rule stated during the administrative proceedings in this

case.  Relator's suggestion lacks merit even without invoking current Ohio Adm.Code 5505-3-02(E).

### Analysis:  R.C. 5508.18(A)(3) 's Requirement
### Regarding the Cause of the Incapacity

{¶ 71} As earlier noted, R.C. 5508.18(A)(3) provides that the healthcare professional appointed by the board shall file a written report containing a finding as to "[t]he cause of the member's incapacity."  Also, supplementing the statutory provision, Ohio Adm.Code 5505-3-02(D) provides that the "examining physician will file a written report with HPRS" with a finding as to "[t]he cause of the member's incapacity."

{¶ 72} Dr. Griesser was the examining physician who filed his report with HPRS. In his report, Dr. Griesser finds:

> It is my opinion Mr. Seabolt is totally and permanently disabled from working for the Ohio State Highway Patrol as he is not able to perform his full job duties. While the proposed fusion surgery will likely relieve most of his pain complaints, he would not now or post-fusion surgery physically be able to fully engage in duties where he might be involved in a physical altercation, would likely require lifting/carry[ing]/pushing and pulling restrictions as well as restrictions on bending, crawling, kneeling and crouching, would not be able to wear the required body armor or gun belt, and/or run for longer distances, all of which are, in my opinion, inconsistent with the physical demands of his current work as described in the listing of his job duties.

{¶ 73} Here, relator argues that Dr. Griesser violated a statutory and regulatory requirement that he determine the cause of relator's incapacity.  In his brief, relator argues:

> R.C. 5505.18 requires that the Report of the independent medical examiner contain a finding as to the cause of the disabling condition. Dr. Griesser's Report, in direct contravention of the mandate of R.C. 5505.18(A), contains no such finding.

(Emphasis sic.) (Relator's brief at 12.)

{¶ 74} Relator also points out that Dr. Griesser failed to opine as to whether relator's incapacity is in the line of duty.  Relator seems to suggest that Dr. Griesser's failure to determine whether the incapacity is in the line of duty is a failure to determine

the "cause" of the disability. The magistrate disagrees. Relator seems to incorrectly equate the cause of relator's incapacity with the mechanism of injury. Clearly, Dr. Griesser was not required by R.C. 5508.18(A) or Ohio Adm.Code 5505-3-02(D) to determine the mechanism of the injury. Relator has in effect argued unsuccessfully that the mechanism of injury is the wearing of his service belt with repeated moving into and out of his patrol vehicle.

### Further Analysis of Dr. Tanner's Reports

{¶ 75} In his October 4, 2016 report, Dr. Tanner states that it is "medically improbable" that wearing a service belt caused the "degenerative changes within a 9 year window" in an "essentially healthy 31 year old male." According to relator, Dr. Tanner's statement is improper because it is allegedly "speculation" or "speculation at best." (Relator's brief at 15; reply brief at 5.)

{¶ 76} Relator cites no authority to support his assertion that Dr. Tanner was engaging in impermissible speculation rather than rendering a medical opinion based upon his medical expertise.

{¶ 77} Just as relator's experts opined that the wearing of the service belt caused the degenerative changes that caused the incapacity, Dr. Tanner was also free to render his own opinion on the matter. Dr. Tanner was not bound by the conclusions of relator's experts. His opinion clearly presents sufficient evidence on the matter.

{¶ 78} Relator objects to Dr. Tanner's opinion in his August 1, 2016 report that a comparison of the two MRI reports shows an absence of "substantial aggravation of this pre-existing condition." As earlier noted, relator underwent an MRI on October 3, 2013 and again on February 1, 2016. The February 1, 2016 MRI report contained an impression of "[n]o significant change since MRI of 10/3/13." In his October 4, 2016 report, Dr. Tanner points to a "lack of diagnostic MRI changes to indicate 'substantial aggravation' of a pre-existing condition." According to relator, Dr. Tanner misunderstands the concept of substantial aggravation of a pre-existing condition. This court need not address relator's objection to Dr. Tanner's opinion as to substantial aggravation. Dr. Tanner's substantial aggravation analysis is but one of several bases for Dr. Tanner's conclusion that relator's disability did not occur in the line of duty.

{¶ 79} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.

/S/ MAGISTRATE
KENNETH W. MACKE

## NOTICE TO THE PARTIES

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).